JAMES, J.
*665 Defendant was charged with multiple crimes for an incident in which, following a domestic dispute with his girlfriend, he drove his employer's truck into her parked car and then proceeded to hit another parked car as he was driving out of the neighborhood. Defendant claimed that the truck had malfunctioned and that he had not intentionally or recklessly driven into either parked car. To prove otherwise, the state offered evidence of other instances in which defendant had driven aggressively through the same neighborhood, including an incident in which he crashed a vehicle over a curb and into a grassy berm after a conflict with his girlfriend. The court admitted that evidence, and the jury found defendant guilty of unauthorized use of a vehicle, first-degree criminal mischief, and second-degree criminal mischief. On appeal, defendant argues that the evidence of his prior misconduct was inadmissible character evidence that should have been excluded under OEC 404 and OEC 403. We hold that evidence that defendant had previously crashed leaving the same neighborhood after a fight with his girlfriend was admissible under the "doctrine of chances" to prove that the charged crimes were not the result of the truck malfunctioning. Defendant's remaining claims of error with regard to the admission of evidence are either unpreserved or fail to demonstrate prejudice to defendant, and we, therefore, affirm.
I. BACKGROUND
The background facts, for purposes of appeal, are undisputed. On November 7, 2015, defendant's girlfriend, Walker, was staying overnight with her mother, Peterson. Around midnight, defendant knocked on the door of Peterson's home and implored Walker to come to his house instead. Walker declined to go, and defendant left. A few minutes later, defendant knocked again, insisting that Walker leave with him. Walker again said no and shut the door.
Shortly thereafter, Peterson heard the sound of defendant either revving the engine or spinning the tires of the truck he was driving, followed by "a very loud crash."
*666 Defendant had driven the truck into Peterson's driveway, where Walker's Mazda had been parked, and he had crashed into the Mazda and pushed it through the garage *685 door, four feet into the garage. Defendant then knocked on the front door again, and he apologized to Walker and Peterson. Walker told him to leave.
Meanwhile, one of Peterson's neighbors, Howard, was in his garage when he heard the sound of tires "burning out," followed by the faint sound of a crash. Howard then heard the sound of an engine revving and picking up speed, followed by an incredibly loud sound "like a bomb went off." He opened his garage door and saw that his own car, a Honda Civic, which had been parked in front of his driveway, was now perpendicular to the road, and a wheel from a larger vehicle had broken off and was stuck in the Civic. He looked around and saw a truck that was stopped in the trees on a wooded lot on the corner across the street. The truck was missing a front wheel, and parts and debris from the truck and the Civic were strewn across the street.
As Howard crossed the street toward the truck, he saw defendant open the door and get out of the truck. It looked to Howard as though defendant was going to run, but Howard stopped him and told him that he had been in an accident and that Howard would help him. Defendant collapsed to the ground as though he were injured or in shock. Another neighbor, Hout, also arrived on the scene. As Hout and Howard were trying to determine what type of aid to administer, defendant suddenly picked up his head and said, "Tell [Walker] I love her." An ambulance arrived and transported defendant to the hospital.
A police officer followed the ambulance to the hospital. Defendant had not sustained any injuries and was released, and the officer arrested him and took him to the police station. On the way to the station, defendant told the officer that the truck "took off" and that "the pedal had slid." Defendant said that the truck belonged to his boss, that it had "significant issues," and that defendant had the truck because he was repairing it.
At the police station, after the police gave him Miranda warnings, defendant asserted that he was not trying to *667 leave Peterson's house "aggressively." He claimed that he had parked on the street and, when he put the truck into drive, it "just took off on him" and "jumped forward." He said that, once he got out of the truck to apologize, Peterson began yelling at him so he left. Defendant also repeated the assertion that his boss had loaned the truck to him to be repaired. When asked about Howard's Civic that had been damaged, defendant stated that the truck had pulled to the right and hit the car.
For that sequence of events, defendant was charged with unauthorized use of a vehicle, ORS 164.135, first-degree criminal mischief, ORS 164.365, failure to perform the duties of a driver, ORS 811.700, and second-degree criminal mischief, ORS 164.354, and he was incarcerated while awaiting trial. During that incarceration, defendant spoke on the phone with Walker about how she could avoid testifying; he also spoke to an unknown woman about whether Walker would have to testify. Defendant told the woman that "[n]obody can say whether I intentionally did something or not because no one was there."
The state, anticipating a claim that the truck had malfunctioned, moved in limine to admit evidence of a previous occasion in which defendant had "driven in the same similar manner in the same neighborhood before, after leaving the girlfriend's residence." The prosecutor represented to the trial court that the two neighbors, Howard and Hout, would testify about an earlier incident when defendant had left Peterson's house and "tore down the street and then crashed somewhere on the street." Defendant objected to the admission of that evidence, arguing that defendant was not charged with reckless driving, so "I don't know what his prior driving through the neighborhood would be relevant for." Defendant also objected that the police reports indicated that Howard had mentioned that defendant had "blazed out of the neighborhood before" but nothing about another accident.
The prosecutor then explained that she had spoken with Hout after the police report was generated, and that Hout had provided additional details, including information *668 about the second crash. The trial court *686 ruled that evidence of that prior incident was admissible, explaining:
"With regard to the incident that occurred prior to this at the-at [Walker's] residence, I do find that that is relevant because * * * this incident on November 7th is at-at her house, it involves a car that he-a Toyota Tundra which is an-the unauthorized use and he's there at the house on November 7th and then that's when the criminal mischief in the first degree occurs and the state has to prove the intent. And his prior conduct with regard to the issues with regard to Ms. Walker and what he's done before then is relevant ."
(Emphasis added.) The court then conducted balancing under OEC 403 and determined that the probative value of the evidence was not substantially outweighed by the risk of prejudice. Accordingly, the court concluded that "it is admissible and I will allow those things that occurred prior over at Ms. Walker's home or neighborhood to be admissible for the jury. They will then be receiving * * * an instruction that's required under [ State v. Leistiko , 352 Or. 172, 282 P.3d 857, adh'd to as modified on recons. , 352 Or. 622, 292 P.3d 522 (2012) ] about prior bad acts that I'll include in the jury instructions."
After the parties had given their opening statements, and just before the state presented its first witness, defendant asked the court to revisit its ruling on the admissibility of the previous incident, based on a conversation defense counsel had with Hout during a recess. Defendant argued that Hout had not seen the driver of the vehicle involved in the earlier incident, and that, even though police had been called during that incident, Walker had not identified defendant as the driver. For that reason, defendant "renewed [his] objection regarding the issue of whether or not there's even enough to show that it was [defendant] who was driving on this prior incident that the State wants to go into."
The prosecutor, in response, explained that Hout was certain that defendant was the driver on that earlier occasion because Hout had later confronted defendant about that incident and nearly gotten into a fight with him. With that additional information that defendant was the driver, *669 the trial court adhered to its earlier ruling and noted that the parties could revisit the issue again at trial, depending on how the evidence came in; the court stated, "[l]et's see where this all takes us. And, if I have to, I'll tell the jury to strike it in the worst case scenario."
During trial, the state elicited testimony about that previous incident, as well as testimony about defendant's driving patterns generally. Under direct examination, Peterson was asked whether she had seen or heard defendant's vehicle before he drove it into her garage. She responded that it was a large, noisy truck, and that she heard him revving the engine when he arrived and when he left. She testified that it concerned her "[b]ecause I live in a really nice residential neighborhood and everybody cares about everyone's kids and animals and-and I have been told by my neighbors to keep him out of the neighborhood and I thought, 'Why? You can't say that to me.' But the neighbors did not like [defendant], so-because he-his driving pattern. He would scream down the street[.]" At that point, defense counsel objected, "for reasons previously stated" without any further elaboration. The court responded, "Based on that objection, overruled."
Later, the prosecutor asked Peterson follow-up questions about defendant's driving. She asked Peterson, "And how would you describe his driving in the neighborhood?" Peterson responded:
"Well, on one occasion, [Walker] and [defendant] had a fight and [defendant] left, got into his truck and just screamed, I mean, just-it was so loud and it was so fast it scared me and so I kept [Walker] in the house. And my neighbors after that event, I think he went up a grassy knoll area, but came over and said, 'We have children and we have pets and we don't want him in the neighborhood anymore. We've heard his truck. We know the way he drives and, you know, we're-we're going to bring your name up to the Board.' And so I thought I might have to move for a while."
While questioning Hout, the prosecutor elicited further details about that incident in *687 which defendant had driven into a grassy area in the neighborhood.
*670 "Q. Okay. Now, you said that you know the defendant. And have you witnessed him driving dangerously in the neighborhood before?
"A. As a matter of fact, I have.
"Q. Okay. Describe that.
"A. After doing a little mental searching around September 14th, it's a nice summer day. I've got a deck out front and I'm sitting on my deck. I hear burning rubber. You know, a car tearing loose. Straight across from me is a green space. You've got a sidewalk, there's a green berm and on the other side of that berm is a little water drainage.
"I hear-I see the car again coming north down 178th heading south. It burns out, hits the curb, goes sideways up into the green space and then kind of launches back down into the street, gets squirrely, almost hits Mr. Howard's car that was inevitably hit in the later incident and I-I run down to the street just in time to make-to make out the vehicle make and model as it careens across Walker Road. No stop, probably doing 35 to 40 miles an hour, full accelerator. Never let off the accelerator.
"Q. What happened? Did you call the police or-
"A. Well, that's when I had the fortune of meeting his girlfriend, [Walker], because she came walking down the sidewalk and I'm like, 'What the F. was that?'
"* * * * *
"A. I could tell that something had happened between the two of them and she was just like kind of, 'Oh, my God.' "
Hout also described the confrontation he had with defendant after the incident. Hout testified that he had been "watching the neighborhood waiting for this guy to come back" and then approached defendant when he saw him:
"I walked up to him, I said, 'Hey, man, are you the guy that came playing Dukes of Hazard through my neighborhood a couple of weeks ago?' He said something to the effect of, 'What if I am?' And I said, 'You know, I'll tell you what, if-you know, if you pull a stunt like that again, you're going to have a serious F-ing problem.' He looked at me and he said, 'You don't know who you're F-ing with,' and I said 'you don't know who you're F-ing with,' and he said-he leaned *671 back on his car with a cigarette and he said, 'Handle your shit, homie,' and I'm like, 'Trust me, if that happens again, I will.' "
Defendant did not object to any of Hout's testimony about the confrontation.
The prosecutor also elicited testimony about defendant's previous driving during an exchange with Howard, the owner of the Civic that had been damaged:
"Q. Okay. And you spoke to the police about [defendant] previously driving recklessly in the neighborhood?
"* * * * *
"A. *** I didn't know who [Walker] was, but I knew that the house on the corner where [Peterson] lived at, that whoever was visiting that residence had a bad habit of racing in and racing out of my neighborhood . And my house is right on the corner, so my house is the first house that a car comes to as it pulls into my neighborhood.
"And I've got, you know, four sons at the house that play either-not in the street, but, you know, when you're playing in the street or you're running across the street, there's a green space directly across the street from my house and all the neighborhood kids gather there and play, so it-it's-it's very upsetting to me when anybody drives in or out of my neighborhood extremely fast.
"Q. Okay. And was that what you were talking about when you told-I think it was Officer Mansfield that you spoke to. Does that sound right?
"A. Right.
"Q. That he'd blazed out of the neighborhood before. You used the word 'blazed.' Does that sound about right?
*688 "A. Correct ."
(Emphases added.)
During her closing argument, the prosecutor told the jurors that they would be instructed about defendant's prior driving incidents, and that those incidents were relevant only to determine whether defendant "had the reckless intent, knowledge or recklessness when committing the crime" and could not be used "to say, well, he did it before and *672 he must have done it this time." The court later instructed the jury consistently with the prosecutor's representation:
"You may not consider the evidence of [defendant's] prior uncharged conduct-conduct of driving unless you first find that he committed the current charged crimes on or about November 7th, 2015. Then and only then may you consider the prior uncharged conduct to determine if [defendant] had the requisite intent, knowledge or recklessness when committing the charged crimes."
The jury ultimately acquitted defendant on the charge of failing to perform the duties of a driver, but it found him guilty on the remaining charges of unauthorized use of a vehicle, first-degree criminal mischief, and second-degree criminal mischief. The court entered a judgment of conviction on those guilty verdicts.
Defendant appeals that judgment, assigning error to the trial court's admission of (1) Peterson's and Hout's testimony about the previous incident in which defendant crashed over the curb and into a grassy area on the same street; (2) Hout's testimony about his confrontation with defendant after that incident; and (3) Howard's testimony that defendant had "blazed" out of the neighborhood before.
II. ANALYSIS
Defendant offers a combined argument on his various assignments of error, treating all of the challenged testimony alike under the general category of inadmissible "other acts evidence." As we will explain, not all of the testimony that defendant challenges is susceptible to that combined treatment, so we address the three categories of evidence separately.
A. Evidence of Previous Crash
Defendant's first and third assignments of error challenge the admissibility of Peterson's and Hout's testimony that defendant had previously crashed a vehicle while leaving Peterson's house after an argument with Walker. The trial court, after considering the similarities between the previous incident and the charged conduct, admitted the evidence to prove that defendant intentionally damaged *673 Walker's car rather than by accident-a nonpropensity theory of relevance known as the "doctrine of chances." See State v. Johns , 301 Or. 535, 548, 725 P.2d 312 (1986) (describing the origins of that doctrine). The "basic idea" behind that theory of relevance is "the proposition that multiple instances of similar conduct are unlikely to occur accidentally." State v. Tena , 362 Or. 514, 524, 412 P.3d 175 (2018).
Defendant advances two arguments as to why the evidence of past conduct was not sufficiently similar to the charged conduct to be admissible under that theory. First, defendant argues that the past incident was an act of reckless driving, whereas first-degree criminal mischief requires proof that defendant intentionally damaged Walker's car; according to defendant, "[t]he fact that defendant drove recklessly through the neighborhood in the past, endangering children and pets, did not have a tendency to show that on the night of the [charged] incident, he got angry and intentionally drove into Walker's car." Second, defendant argues that only prior acts involving similar claims of accident are admissible under the doctrine of chances, and defendant never claimed that the earlier crash involved a similar malfunction of his vehicle.
Both of those arguments require us to revisit the principles underlying the doctrine of chances, and the type of similarity that satisfies that doctrine. In Johns , the court traced the roots of that theory of relevance to John Henry Wigmore: "Wigmore's logical relevance theory is based on improbability and demands proof of similarity." 301 Or. at 552, 725 P.2d 312. Under that theory, the *689 "proponent uses uncharged misconduct evidence inductively and probabilistically":
"The doctrine teaches us that the more often the defendant performs the actus reus , the smaller is the likelihood that the defendant acted with an innocent state of mind. The recurrence or repetition of the act increases the likelihood of a mens rea or mind at fault. In isolation, it might be plausible that the defendant acted accidentally or innocently; a single act could easily be explained on that basis. However, in the context of other misdeeds, the defendant's act takes on an entirely different light. The fortuitous coincidence becomes too abnormal, bizarre, implausible, unusual *674 or objectively improbable to be believed. The coincidence becomes telling evidence of mens rea."
Id. at 552-53, 725 P.2d 312 (quoting Imwinkelried, Uncharged Misconduct Evidence 8, § 5:05 (1984) (emphasis added)).
The nature of that intermediate inference-that the coincidence of events is objectively improbable-is what separates the doctrine of chances from character-based reasoning. "Wigmore's theory of logical relevance does not depend on a character inference because the proponent is not asking the trier of fact to infer the defendant's conduct (entertaining a particular mens rea ) from the defendant's subjective character." 301 Or. at 554, 725 P.2d 312 (describing Imwinkelried's observation about Wigmore's theory). Rather, "[t]he intermediate inference is an objective likelihood under the doctrine of chances rather than a subjective probability based on the defendant's character ." Id. (emphasis added); see Leistiko , 352 Or. at 182, 282 P.3d 857 (explaining that relevance under the doctrine of chances does not derive from a character-based inference but "depends instead on the proposition that multiple instances of similar conduct are unlikely to occur accidentally"); Clifford S. Fishman and Anne T. McKenna, 3 Jones on Evidence , § 17:62 (7th ed. 2019 Update) ("The key factors in applying the doctrine are the number of extrinsic incidents, and their similarity to the facts alleged in the case being tried.").
In Johns , the court observed that legal commentators had split on the number of prior acts required to invoke the doctrine, with some concluding that, "to resort to the probability doctrine the proponent must have evidence of more than one prior similar instance of conduct," and others asserting that even a single similar act would have logical relevance on the issue of intent. 301 Or. at 554-55, 725 P.2d 312. Rather than take a categorical approach to that question or to the degree of similarity required, Johns adopted a case-by-case approach:
"Depending upon the circumstances of the case, sometimes one prior similar act will be sufficiently relevant for admissibility and sometimes not. A simple, unremarkable single instance of prior conduct probably will not qualify, but a complex act requiring several steps, particularly *675 premeditated, may well qualify . These decisions must be made case-by-case, with the trial judge first determining whether the evidence has any probative value under OEC 401 as applied to intent under OEC 404(3), then deciding whether the evidence has any prejudicial effect outweighing its probability under OEC 403. The more prior similar acts, the stronger the probative value; the fewer, the less the probative value. The same is true of the similarity of the prior acts and of the time element. The prior acts need not be identical. The greater the degree of similarity of the prior acts, the greater the relevancy; the less similarity, the less probative value . As to the time element, the closer in time of the prior act to the act charged, the greater the probative value; the more remote, the less probative value. No categorical rule controls inclusion or exclusion."
Id. at 555, 725 P.2d 312 (emphases added; footnote omitted).
The court then announced a test that trial courts should employ before admitting evidence on a "doctrine of chances" theory:
"To sum up, in evaluating prior crime evidence on the issue of intent or absence of mistake, the trial judge should make these determinations:
"(1) Does the present charged act require proof of intent?
"(2) Did the prior act require intent?
*690 "(3) Was the victim in the prior act the same victim or in the same class as the victim in the present case?
"(4) Was the type of prior act the same or similar to the acts involved in the charged crime?
"(5) Were the physical elements of the prior act and the present act similar?
"(6) If these criteria are met, is the probative value of the prior act evidence substantially outweighed by the danger of unfair prejudice, confusion of issues or misleading the jury, undue delay or presentation of cumulative evidence?"
Id. at 555-56, 725 P.2d 312. That test remains the governing standard in Oregon for the admissibility of evidence offered to prove intent under the doctrine of chances. See *676 State v. Jones , 285 Or. App. 680, 689, 398 P.3d 376 (2017) ("Specifically, to establish that the prior conduct was relevant to show, using the doctrine of chances, that defendant acted intentionally and not by accident or mistake, the state would have had to establish that the prior conduct and the charged conduct were similar, as required by Johns .").
With the Johns framework in mind, we turn to the parties' arguments about the uncharged misconduct in this case, beginning with defendant's threshold contention that evidence of prior acts is logically relevant under the doctrine of chances only when the other acts similarly involve claims of accident or mistake. That view of the doctrine of chances is based on a footnote in our decision in State v. Tena , 281 Or. App. 57, 384 P.3d 521 (2016), rev'd , 362 Or. 514, 412 P.3d 175 (2018), in which we described the "improbability of a 'fortuitous coincidence' " under Johns . We noted:
"Because the doctrine of chances is premised on the idea that it is unlikely that multiple instances of similar conduct will be the result of an innocent intent, evidence is logically relevant under the doctrine only when the other acts involve innocent intents . In other words, because the doctrine is based on the idea that recurring similar mistakes or accidents are increasingly unlikely, the doctrine supports the admission of other acts evidence only when the other acts were, or are claimed to have been, the product of a mistake or accident ."
281 Or. App. at 64 n. 4, 384 P.3d 521 (emphases added).
What we described in that footnote was one application of the doctrine of chances-and the easiest one to distinguish from a propensity-based theory. In that application, the jury is asked to infer whether "the uncharged incidents are so numerous that it is objectively improbable that so many accidents would befall the accused." Edward J. Imwinkelried, The Use of Evidence of an Accused's Uncharged Misconduct to Prove Mens Rea: The Doctrines Which Threaten to Engulf the Character Evidence Prohibition , 51 Ohio St. L.J. 575, 586-87 (1990) ; see Johns , 301 Or. at 553, 725 P.2d 312 (describing Wigmore's illustration of the doctrine in which "[t]he argument here is purely from the point of view of the doctrine of chances-the instinctive recognition of that logical process *677 which eliminates the element of innocent intent by multiplying instances of the same result until it is perceived that this element cannot explain them all"); id. at 554, 725 P.2d 312 (describing Imwinkelried's view that "the linchpin of Wigmore's argument is that 'the chances of an inadvertent shooting on three successive similar occasions are extremely small' "); see, e.g ., United States v. Russell , 19 F. 591, 592 (W.D. Tex. 1884) ("[S]uppose you lose your horse; you find it in the possession of A; he asserts that he took the horse by mistake; but you find that about the same time he took horses belonging to several others; would not the fact that he took others about the same time be proper evidence to be considered in determining whether the particular taking was or not by mistake? The chances of mistake decrease in proportion as the alleged mistakes increase.").
But Johns did not limit the doctrine of chances to circumstances in which the prior acts were claimed to have been accidents or mistakes. In fact, Johns itself involved the admission of a prior act that was undisputedly intentional . In Johns , the defendant was charged with murdering his spouse, and he claimed that he shot her by accident. To rebut that contention, the prosecution sought *691 to admit evidence that the defendant had threatened to shoot and assaulted a different spouse six years earlier. The evidence of that prior incident included testimony from an officer that the defendant "did say that when he pointed the gun at [the earlier spouse] he wanted to shoot her and himself." Id. at 541, 725 P.2d 312. The Supreme Court, after applying the framework described above, concluded that the evidence of the prior assault was "directly relevant" and admissible to show defendant's intent with regard to the charged murder.
In contrast to the application described in our footnote in Tena , the type of inferential reasoning permitted by Johns -that the defendant's similar attempt to murder a spouse on one previous occasion made it more likely that he formed the same mens rea on the charged occasion-is more difficult to distinguish from a propensity-based inference. Specifically, even if a previous occasion is probative evidence of a defendant's intent on a second occasion, it is not readily apparent how relying on the defendant's perceived intent on *678 the first occasion-the unspoken but assumed link between the two-is not relying on a classic propensity theory of admissibility.
It is an understatement to say that the line between propensity and nonpropensity inferences is difficult to discern under Oregon law. See Laird C. Kirkpatrick, Oregon Evidence , § 404.06(1), 218-19 (6th ed. 2013) (observing that the use of prior bad acts to prove intent "may be hard to distinguish" from using the evidence to show that "they had certain propensities and that they acted in accordance with those propensities on a particular occasion"). In State v. Davis , 290 Or. App. 244, 253, 414 P.3d 887 (2018), we explained that "character-based reasoning is 'based on inferred behavioral disposition or propensities,' and it relies upon 'a chain of inferences that employs the evidence to establish that the person (1) is more inclined to act or think in a given way than is typical, and (2) is therefore more likely to have acted or thought that way on a particular occasion.' " (Quoting 1 McCormick on Evidence § 186 (7th ed. 2016) ). By that definition, the chain of inferences in Johns , based on a single, intentional act, is nearly impossible to distinguish from a character-based theory. And, parts of Johns itself are ambiguous as to whether a propensity to act or form a particular mens rea under specific circumstances is truly distinct from character evidence. See 301 Or. at 551, 725 P.2d 312 ("Although not conclusive, such evidence certainly could be probative to show that when similarly agitated in a domestic setting defendant will act violently and intentionally . If the defendant had killed or attempted to kill two previous spouses under similar circumstances, the evidence would be highly relevant to prove that a killing of a third spouse was not an accident." (Emphasis added.)).
The problem is particularly stark in doctrine-of-chances cases, but it is hardly confined to that theory of relevance. To date, the Supreme Court has left open the question whether other-acts evidence that establishes a defendant's "sexual purpose" toward a minor victim is a propensity or nonpropensity theory, but it has suggested that it may be different from pure character evidence. See State v. Williams , 357 Or. 1, 23, 346 P.3d 455 (2015) ("In this case, *679 there is a slim but distinct difference between using the underwear evidence to establish defendant's character and propensity to act accordingly, and offering that evidence to establish defendant's sexual purpose."). The Supreme Court has also held that evidence of prior acts showing a defendant's "predisposition" toward a particular victim is admissible on a nonpropensity theory. See State v. McKay , 309 Or. 305, 308, 787 P.2d 479 (1990) (holding that previous acts of abuse against the same victim were "admissible to demonstrate the sexual predisposition this defendant had for this particular victim, that is, to show the sexual inclination of defendant towards the victim, not that he had a character trait or propensity to engage in sexual misconduct generally"). And, in Davis , the state "more or less acknowledged that possessing a peculiar sexual interest is a 'character trait' to the extent that it involves a 'propensity' to have a particular mental state (as opposed to a propensity to commit the actus reus )" but argued that "uncharged misconduct that evinces a tendency to possess a specific mental *692 state is not 'character' evidence because it does not depend on an inference that the person acted in conformity with his character, but rather on an inference that, when he acted, his thoughts were consistent with his established tendencies." 290 Or. App. at 256, 414 P.3d 887. We did not conclusively resolve that issue, id. , and there remains some uncertainty in Oregon case law regarding when a theory of relevance based on a tendency to possess a particular mental state is a propensity or nonpropensity theory for purposes of OEC 403 and OEC 404.
Nonetheless, Johns endorsed a version of the doctrine of chances that looked to previously adjudicated conduct to prove intent, and the Supreme Court has never disavowed that application of it. In fact, the court's subsequent formulations of the doctrine have continued to focus on the inferences that can be drawn from previous intentional acts, without any suggestion that the doctrine is limited in the way that defendant or our dicta in Tena suggests. See, e.g. , Tena , 362 Or. at 524, 412 P.3d 175 ("The more often a defendant intentionally performs an act, the less likely it is that, when the defendant performs the act again, he or she did so accidentally or innocently.").
*680 In other words, we are not writing on a clean slate with regard to whether the doctrine of chances can be invoked based on a single prior incident of undisputedly intentional conduct. We are well aware that, over the years, legal commentators have criticized the "doctrine of chances" under multiple theories. One line of criticism has accused the doctrine of being "nothing more than a smokescreen for bad-character reasoning," arguing "that the probability reasoning underlying the doctrine is propensity-based" and that, "once random, innocent chance is eliminated, the only remaining logical route to the ultimate inference is an intermediate inference assuming the accused's bad character." Imwinkelried, Criminal Minds: The Need to Refine the Application of the Doctrine of Objective Chances As A Justification for Introducing Uncharged Misconduct Evidence to Prove Intent , 45 Hofstra L. Rev. 851, 867-68 (2017) (describing that criticism and citing Andrew J. Morris, Federal Rule of Evidence 404(b): The Fictitious Ban on Character Reasoning from Other Crime Evidence , 17 Rev. Litig. 181, 199-201 (1998) ; Paul F. Rothstein, Intellectual Coherence in an Evidence Code , 28 Loy. L.A. L. Rev. 1259, 1262-64 (1995) ; and Lisa Marshall, Note, The Character of Discrimination Law: The Incompatibility of Rule 404 and Employment Discrimination Suits , 114 Yale L.J. 1063, 1085-86 (2005) ).
Another line of criticism emphasizes the doctrine's inconsistent mathematical foundations. Although the "doctrine of chances" purports to be based on mathematical probabilities, courts have rarely insisted that the proponent of the evidence actually produce data to support the underlying assumptions about how often a particular event occurs. See Imwinkelried, Criminal Minds: The Need to Refine the Application of the Doctrine of Objective Chances As A Justification for Introducing Uncharged Misconduct Evidence to Prove Intent , 45 Hofstra L. Rev. at 863-64 (arguing that, in some cases, a "judge can rely on common sense and experience to conclude that a particular type of event is a once-in-a-lifetime experience," but that, "[i]n other cases, though, the judge should demand that the prosecution produce evidence of the baseline frequency of such events"). And, even with data about the frequency that a particular person might be involved in similar events, some *681 commentators have questioned whether the intermediate inference is nevertheless dependent on a character inference. See, e.g ., Morris, Federal Rule of Evidence 404(b): The Fictitious Ban on Character Reasoning from Other Crime Evidence , 17 Rev. Litig. at 193-94 (explaining that "the doctrine of chances produces these long odds only by assuming that the defendant's character remains constant across time"); see also State v. Pankow , 144 Wis. 2d 23, 422 N.W. 2d 913 (Ct. App. 1988) (wherein the court attempts to inject more mathematical rigidity to the doctrine).
Whatever the merits of that criticism, and whatever the lure of the conceptualization broached by our footnote in Tena , 281 Or. App. at 64 n. 4, 384 P.3d 521, ultimately we are bound by the holding in Johns . Here, because defendant has not offered a principled *693 way to distinguish Johns , we reject his argument that the doctrine of chances is limited to prior acts that are claimed to have been mistakes or accidents.
Defendant's alternative argument is that, accidental or not, the mental states between the charged act of first-degree criminal mischief and the prior act of reckless driving are not similar enough for the doctrine of chances to apply. That contention, too, is based on an overly restrictive view of the doctrine of chances as it has been applied in Oregon. As the Supreme Court has stated, "intent" under the doctrine of chances is not synonymous with "intent" or "intention" under Oregon's criminal code:
"Wigmore used the word 'intent' broadly. See Wigmore, 2 Evidence § 301 at 238. He explained that 'intent more frequently signifies * * * merely the absence of accident, inadvertence, or [causality]-a varying state of mind which is the contrary of an innocent state of mind.' Id. Accordingly, when Wigmore, and Johns in reliance on Wigmore, refers to the absence of mistake or accident as the equivalent of intent, it does not appear that either is using intent only in the limited sense that the Oregon criminal statutes use that term . Cf. ORS 161.085(7) (defining intentionally or with intent)."
Leistiko , 352 Or. at 184 n. 9, 282 P.3d 857 (emphasis added).
With that understanding of "intent" under the doctrine of chances, we conclude that defendant's previous driving incident was sufficiently similar to the charged acts *682 under the Johns factors. Both incidents required "intent" in the sense that defendant, upset after a domestic dispute, was purposefully driving the vehicles in an angry and aggressive manner rather than at the mercy of a mechanical malfunction. The victims in both cases were the same: neighbors and anyone else on the street where defendant's girlfriend resided. The types of acts in both incidents were similar, with defendant becoming angry after a fight with his girlfriend and using his vehicle to express that anger while leaving the house. And the physical elements of the two were extremely similar and occurred less than two months apart: In the charged incident, after a fight with his girlfriend, defendant left her house, revved his engine, squealed his tires, crashed into a car in the driveway, and then drove wildly down the street, careening into Howard's car and ultimately crashing into a tree. In the previous incident, after a fight with his girlfriend, defendant left the house, revved his engine, squealed his tires, accelerated rapidly down the same street, narrowly missing Howard's car, crashed into the curb, and drove up onto a grassy berm.
In light of those similarities in the mental states, the settings, and the sequence of events, this case, like Johns , is not a case involving a "simple, unremarkable single instance" of prior conduct. 301 Or. at 555, 725 P.2d 312. Cf. Leistiko , 352 Or. at 186-87, 282 P.3d 857 (the fact that, on one other occasion, the defendant resorted to force with a woman who resisted his advances was not "sufficiently relevant to prove that he acted intentionally regarding [another] woman"). Nor do we understand defendant to be making an argument that the prior incident in this case lacks sufficient complexity. See, e.g. , State v. Allen , 301 Or. 569, 575, 725 P.2d 331 (1986) ("As we set forth in Johns , these cases become more difficult when there is only one prior relevant act, but this lack of multiplicity does not foreclose admissibility. We look to the complexity of the prior act. Indeed, in this case the complexity of the prior act and the present crime is obvious. The hiring of a willing accomplice to set a dwelling or building on fire so that defendant could fraudulently collect insurance proceeds is no simple, impulsive criminal act. Such a crime includes, among other things, premeditation, planning, concealment and knowledge."). Rather, the two incidents were *683 enough alike, sufficiently bizarre, and close enough in time to be probative of the likelihood that the charged incident involved a malfunctioning vehicle as opposed to a volitional act by defendant. See Edward J. Imwinkelried, The Dispute over the Doctrine of Chances Relying on the Concept of Relative Frequency to Admit Uncharged Misconduct Evidence , Crim. Just. 16, 53 (1992) ("To apply the doctrine intelligently, the court must inquire how often the typical, innocent person is *694 likely to sustain this sort of loss or become involved in such circumstances. That level of incidence is the threshold which the total number of incidents implicating the accused (both charged and uncharged) must exceed."). In short, such similar incidents involving defendant, over such a short span of time, makes defendant's explanation of a "fortuitous coincidence" related to the truck "too abnormal, bizarre, implausible, unusual or objectively improbable to be believed. The coincidence becomes telling evidence of mens rea " apart from any strictly character-based inference. Johns , 301 Or. at 552-53, 725 P.2d 312 (quoting Imwinkelried, Uncharged Misconduct Evidence 8, § 5:05 (1984)); see Edward J. Imwinkelried, Criminal Minds: The Need to Refine the Application of the Doctrine of Objective Chances As A Justification for Introducing Uncharged Misconduct Evidence to Prove Intent , 45 Hofstra L. Rev. at 863 ("If an innocent person is likely to become involved in that type of event only once in his or her lifetime, proof of a single uncharged, similar incident suffices to trigger the doctrine.").
Moreover, on this record, we cannot say that the trial court erred when balancing the probative value of the evidence against the danger of unfair prejudice. As defendant observed in his jailhouse call, "no one was there" when he crashed into the victims' cars, so the state was required to prove his intent by circumstantial evidence. See Johns , 301 Or. at 551, 725 P.2d 312 (noting that specific intent "is often the most difficult element of a crime to prove because many crimes are unwitnessed and even if a witness is present, the witness can only surmise the actor's state of mind"). Whether the truck malfunctioned, as defendant claimed, was a key issue in the case, and the prior driving incident cast defendant's explanation in a different light. Conversely, the risk of unfair prejudice-that the jury would convict defendant *684 because he fought with his girlfriend and was an aggressive or reckless driver on an earlier occasion-was somewhat abated by the court's instruction, which required the jury to find that the charged acts occurred before considering the earlier conduct. Moreover, the prior acts were not particularly inflammatory in comparison to the charged conduct, which was of a similar nature but even more egregious than the earlier incident. On the whole, the court acted within its discretion in admitting, to disprove a claim of accident, Peterson's and Hout's testimony about the earlier driving incident following a fight with his girlfriend.
B. Evidence of Confrontation with Hout
In his fourth assignment of error, defendant contends that the trial court erred in admitting Hout's testimony about his confrontation with defendant a couple of weeks after defendant crashed into the berm. Hout's testimony painted defendant as unremorseful (" 'What if I am?' " the one who crashed) and intimidating (" 'You don't know who you're F-ing with[.]' "). On appeal, defendant argues that the confrontation did not tell the jury anything about defendant's state of mind on the night of the charged incident and "tended to further establish that defendant was not only aware of the risks that his driving posed, but that he also did not care about those risks. *** [I]t served only to paint defendant in a bad light and show his 'disposition to do evil.' "
Defendant never made that argument below or, for that matter, objected at all to admission of the evidence of the confrontation between Hout and defendant. The first mention in the trial transcript of the confrontation occurred after the court ruled on the state's motion in limine , when defendant asked the court to revisit that ruling on the ground that Hout had not seen the driver involved. It was in that specific context, discussing the foundation for Hout's proffered testimony about defendant's driving, that the parties referenced the confrontation. There was no discussion at that time about whether Hout would be permitted to testify about the substance of the confrontation; the court simply adhered to its earlier ruling on the admissibility of the driving incident and expressed a willingness to revisit the *685 question of admissibility after seeing "where this all takes us."
At trial, Hout testified without objection from defendant. Had defendant challenged the admissibility of testimony about *695 his confrontation with Hout, either pretrial or at the time of Hout's testimony, the trial court record would have developed very differently. For one thing, much of the pretrial focus of the parties was on the charge of first-degree criminal mischief, and whether the prior acts were relevant to prove that defendant intentionally damaged property. But, defendant was also charged with second-degree criminal mischief for recklessly damaging Howard's car, and his confrontation with Hout was arguably probative of defendant's knowledge of the risks posed by his driving. In fact, defendant seems to acknowledge that probative value when he argues that the testimony about the confrontation "tended to further establish that defendant was not only aware of the risks that his driving posed, but that he also did not care about those risks." Because neither the trial court nor the state was given an opportunity below to address the issues raised by defendant's fourth assignment of error, we reject it on preservation grounds. See Peeples v. Lampert , 345 Or. 209, 219-20, 191 P.3d 637 (2008) (explaining that the purposes of the preservation requirement are to (1) apprise the trial court of a party's position such that it can consider and rule on it, (2) ensure fairness to the opposing party by avoiding surprise and allowing that party to address all issues raised, and (3) foster full development of the record).
C. Evidence of Driving Habits Generally
Defendant's second assignment of error concerns the admission of testimony by Howard that defendant "blazed out of the neighborhood before." His first and third assignments also arguably encompass testimony by Peterson and Hout about defendant's reckless driving more generally, apart from the earlier incident in which he crashed over the curb and onto a grassy berm. To the extent that the court admitted evidence of defendant's general driving habits under the doctrine of chances, that was error; the record does not provide sufficient detail regarding the circumstances of other occasions of defendant's driving to satisfy Johns . However, *686 we fail to see how the admission of that testimony would have prejudiced defendant in light of the admissible testimony about the earlier incident and the unobjected-to testimony about defendant's confrontation with Hout. In light of that other, more detailed testimony about defendant's aggressive driving and his awareness of its risks, and considering the nature of the charged offenses, there is little likelihood that the jury's verdict was affected at all by the references to his general driving habits. See State v. Davis , 336 Or. 19, 33, 77 P.3d 1111 (2003) (holding that evidentiary error is harmless for the purposes of Article VII (Amended), section 3, of the Oregon Constitution, if "there is little likelihood that the error affected the verdict"). Because any error in admitting that evidence was harmless, it provides no basis on which to reverse defendant's convictions. Id.
III. CONCLUSION
The trial court did not err in admitting evidence that defendant had similarly driven angrily and crashed a vehicle on the same street after a fight with his girlfriend, because that evidence tended to rebut his claim of accident based on his truck malfunctioning. We reject defendant's remaining claims of error on the ground that they are either unpreserved or fail to demonstrate prejudice. We, therefore, affirm the judgment of the trial court.
Affirmed.