***This is a nonprecedential memorandum opinion
pursuant to ORAP 10.30 and may not be cited
except as provided in ORAP 10.30(1).***

Argued and submitted May 11; reversed in part and remanded, otherwise
affirmed September 8; petition for review denied December 29, 2022
(370 Or 694)

STATE OF OREGON,
*Plaintiff-Appellant,*

*v.*

DANIEL JAMES BURDA,
*Defendant-Respondent.*

Jackson County Circuit Court
19CR44452; A174410

Lorenzo A. Mejia, Judge.

Lauren P. Robertson, Assistant Attorney General, argued the cause for appellant. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Neil F. Byl, Deputy Public Defender, argued the cause for respondent. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Before Tookey, Presiding Judge, and Egan, Judge, and Kamins, Judge.

KAMINS, J.

Reversed in part and remanded; otherwise affirmed.

**KAMINS, J.**

Defendant was charged with one count of second-degree manslaughter, ORS 163.125, one count of criminally negligent homicide, ORS 163.145, one count of first-degree criminal mistreatment, ORS 163.205, one count of second-degree abuse of a corpse, ORS 166.085, one count of fraudulent use of a credit card, ORS 165.055, one count of second-degree theft, ORS 164.045, and seven counts of aggravated identity theft, ORS 165.803. The state appeals a pretrial order excluding certain categories of evidence, raising six assignments of error. In sum, we conclude that the trial court correctly excluded evidence of defendant's drug use and statements unrelated to defendant's refusal to leave the victim's home but erred in excluding evidence relevant to defendant's motive. Therefore, we reverse the order in part, remand, and otherwise affirm.

The victim, who was "advanced in age," was found dead in his home, buried under an "extremely large" pile of clothing (weighing approximately 100 pounds, according to the state). The state's theory of the case is, in short, that when the victim attempted to evict defendant, defendant either "pushed [the victim] down to leave him to die, and then ultimately covered up the body with 100 pounds of clothes, or there was some kind of a struggle that led to his death." After the victim's death, defendant continued to live in the victim's home and made statements to police suggesting that he believed he would inherit the home.

Although evidence indicated that the victim died on or about July 15, 2018, the victim's body was not found until April 4, 2019. Due to the condition of the body, the state was unable to determine a cause of death. No witness was present when the victim allegedly tried to evict defendant on July 15, 2018, or when defendant allegedly caused the victim's death.

Prior to defendant's trial, defendant filed two motions *in limine*. First, defendant moved to exclude evidence of prior acts "attributable to defendant which are not plead in the indictment." In response, the state argued that the prior-acts evidence it would seek to introduce was relevant for nonpropensity purposes under OEC 404(3). Second,

defendant moved to exclude evidence of an "interrogation of Defendant conducted by Brian Strickland," a polygraph examiner. In response, the state argued, in relevant part, that "[d]efendant's statements regarding the charged conduct [during the Strickland interview] are clearly relevant and admissible under OEC 401 and OEC 402."

The trial court held a hearing regarding the motions, received evidence, and heard arguments from the parties. The court ultimately entered an order excluding the following categories of evidence:

"1.   Statements and evidence regarding Defendant's drug use ***; except for impeachment should Defendant testify,

"2.   Statements regarding prior verbal and physical conflicts (arguments) between Defendant and [the victim] ***;

"3.   [The victim's] call to 9-1-1 regarding eviction of Defendant ***;

"4.   Statements and evidence regarding attempts to evict Defendant ***;

"5.   Statements regarding Defendant's history of and circumstances related to housing, homelessness, and loss of housing (evictions) ***;

"6.   Evidence regarding Defendant's prior behaviors as testified to by Jim Willeford and Mr. Kirk Peterson, Defendant's alleged 'escalation' in behavior following 2017, and any statements or evidence related thereto ***;

"7.   All evidence regarding Defendant's homosexuality ***; and

"8.   The interview of Defendant conducted by Brian Strickland ***."

On appeal, in its first five assignments of error, the state challenges the trial court's exclusion of evidence of the following: (1) defendant's housing difficulties and experiences with homelessness; (2) the victim's call to 9-1-1 requesting assistance with defendant's removal from the victim's property; (3) defendant's confrontations with the victim prior to the victim's disappearance; and (4) defendant's drug use. In a combined argument, the state contends that that "evidence was relevant for nonpropensity purposes under OEC 404(3),

to prove defendant's motive, identity, and mental state." In its sixth assignment of error, the state contends that "the trial court erred in excluding defendant's interview[] with Strickland on the basis that [it was] not relevant."

"We review a trial court's determination that evidence is relevant for legal error, in light of the record that was before the court at the time it made its decision." *State v. Davis*, 290 Or App 244, 246-47, 414 P3d 887 (2018) (internal citation and quotation marks omitted). And "[w]e review a trial court's determination of whether other acts evidence is relevant for a nonpropensity purpose under OEC 404(3) for errors of law." *State v. Tinoco-Camarena*, 311 Or App 295, 297, 489 P3d 572, *rev den*, 368 Or 561 (2021).

*Defendant's drug use.* In the trial court, the state argued evidence that defendant was a frequent user of methamphetamine, and that methamphetamine use affected his behavior, was relevant to defendant's "state of mind" during the events in question, was not propensity evidence, and was therefore not rendered inadmissible by operation of OEC 404(3). Defendant contended that the state's proffered theory of relevance was based on improper propensity reasoning.

The trial court's apparent determination to exclude evidence of defendant's drug use under OEC 404(3) was not error. At its core, the state's theory of relevance was that, because defendant used methamphetamine and acted erratically on some occasions, he was likely acting erratically due to drug use at the time of the charged conduct. Without some additional connecting link between defendant's use of methamphetamine and the charged offenses, we conclude that the state's theory relied on propensity reasoning. *See State v. Skillicorn*, 367 Or 464, 466, 479 P3d 254 (2021) ("OEC 404(3) prohibits the admission of uncharged misconduct evidence for the purpose of arguing that a person has a propensity to commit certain acts, and therefore, it is more likely that the person committed such an act during the incident at issue.").

*Defendant's confrontations with the victim before the victim's disappearance and the victim's 9-1-1 call.* In the trial court, the state argued that evidence of defendant's

confrontations with the victim before the victim's disappearance, as observed by the victim's neighbors, which included occasions where the victim expressed or demonstrated that defendant was not welcome at the victim's house, was relevant to defendant's motive—*i.e.*, that defendant wanted to stay in the victim's house when the victim wanted defendant out of the house—and that that evidence therefore was not rendered inadmissible by operation of OEC 404(3). The state also argued that evidence of a 9-1-1 call made by the victim on July 11, 2018, seeking help evicting defendant, was relevant for the same reason. And the state argued that evidence of a conversation between the victim and the victim's friend on the morning of July 15, 2018, where the victim told his friend that the victim had tried to evict defendant and defendant pushed the victim to the ground and hit the victim, was relevant for the same reason.

The trial court ruled that the evidence of the neighbors' observations of conflicts between defendant and the victim was "too remote in time" to be relevant and that the 9-1-1 call was not "probative of anything in dispute." Consistent with those rulings, the trial court excluded "[s]tatements regarding prior verbal and physical conflicts (arguments) between Defendant and [the victim]," the victim's "call to 9-1-1 regarding eviction of Defendant," and "statements and evidence regarding attempts to evict Defendant."

On appeal, the state contends that the evidence of defendant's confrontations with the victim before the victim's disappearance and the victim's 9-1-1 call was relevant and admissible as nonpropensity evidence, both because it *supplied* defendant's motive in causing the death of the victim and because it evinced that defendant acted with the *same* motive during those events as when he caused the death of the victim. *See Tinoco-Camarena*, 311 Or App at 302-03 ("There are different types of motive evidence. One type of motive evidence includes instances where the other-acts evidence directly supplies the motive for the charged crime, amounting to a cause-and-effect relationship. * * * Another type of motive evidence occurs when the other-acts and the charged crime are both explainable as a result of the same motive." (Internal citation and quotation marks omitted.)). Defendant responds that, "because the confrontation

evidence offered by the state does not demonstrate the roots of the prior disagreements, and the state has no evidence of the circumstances of the deceased's death," it is "impossible to evaluate whether the same motive that drove defendant's prior acts also drove the current hypothesized acts."

We conclude that the trial court erred in excluding evidence of the prior conflicts between the victim and defendant in which the victim expressed or demonstrated that defendant was not welcome at the victim's home, the victim's 9-1-1 call concerning eviction of defendant, and the victim's statement that he had tried to evict defendant. That evidence was relevant under OEC 401, because it "supplied the motive" for defendant to commit the charged acts under the state's theory—*i.e.*, at the time of the charged conduct, defendant wanted to stay in the victim's house, and the victim had repeatedly attempted to remove defendant from the property—and that motive evidence was not dependent on impermissible character inferences under OEC 404(3).[1] *Id.* at 303 ("No matter what sort of motive evidence is offered, the proponent must be able to show that the other-acts evidence furnishes or exemplifies the motive without relying on impermissible character inferences.").

Additionally, the trial court erred in excluding the victim's statements to his friend that, after he had tried to evict defendant, defendant had pushed him to the ground and hit him. The victim related that information to his friend on July 15, 2018—the last day that the victim was seen alive—and that conduct by defendant appears to have occurred within the month prior to the victim's death.[2] In the circumstances of this case—in particular, the repeated

---

[1] The trial court also ruled that the victim's call to 9-1-1 was inadmissible because it was "highly prejudicial," which we understand to be a reference to OEC 403. *See* OEC 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."). Because the trial court erred in excluding the victim's 9-1-1 call as irrelevant, the trial court on remand will have the opportunity to again consider the evidence under OEC 403 in light of the relevancy of the evidence to the state's theory of motive.

[2] The state's arguments on appeal are limited to evidence of confrontations between the victim and defendant that occurred in the month leading up to the victim's disappearance. Our conclusion regarding the relevance of such confrontations is limited to those events in the month prior to the victim's disappearance.

demands that defendant leave the victim's home in the month prior to July 15, 2018—defendant's earlier conduct in response to the victim's attempt to evict him was admissible as "common motive" evidence. *See State v. Morrow*, 299 Or App 31, 49, 448 P3d 1176 (2019) (describing "common motive" evidence as evidence of "a single motive that persisted over a period of time and motivated multiple acts of violence during that time"); *see State v. Edwards*, 282 Or App 328, 332-33, 385 P3d 1088 (2016), *rev den*, 361 Or 801 (2017) ("There was sufficient evidence in the record to support an inference that the same 'jealousy issue' that led to defendant's assault of [the victim] on September 13 led to assaults against [the victim] on the charged occasions [of September 21 and October 18]."). That is, the evidence allows for an inference that a common motive was at work when defendant assaulted the victim after the victim attempted to evict him and when defendant, according to the state, "let [the victim] die" after the alleged altercation on July 15, 2018. *See Morrow*, 299 Or App at 42 (noting common motive can be inferred when "the nature of the evidence at issue, evaluated in light of the circumstances of the crime, makes the inference a logical one" (internal quotation marks omitted)).

However, confrontations overheard by the neighbors between defendant and the victim that did not include an expression of the victim's desire to remove defendant from the house—*e.g.*, the victim's statements to defendant, "Where'd the money go we just gave you" and "We don't have any more money"—are not relevant to defendant's alleged motive to "stay in the house" under either a "supplied the motive" or "common motive" theory, nor to any other non-propensity theory of relevance advanced by the state. Thus, the trial court did not err in excluding that evidence.

*Defendant's housing difficulties and struggles with homelessness.* We turn to the trial court's exclusion of what, on appeal, the state describes as evidence of "defendant's housing difficulties" and "struggles with homelessness."

In the trial court, the state asserted as relevant for nonpropensity purposes evidence that, in the years prior to the charged conduct, defendant "rotated" between living at the victim's house, two other individuals' houses, and being

homeless; that, prior to the charged conduct, defendant was no longer welcome to stay with other individuals with whom he had resided; that defendant did not like being homeless; and that defendant had sustained injuries while homeless. On appeal, the state argues that defendant's housing difficulties are relevant, because they demonstrate that, at the time of the charged conduct, if he was forced out of the victim's house, defendant had no place to reside, which was an undesirable outcome for defendant.

We agree with the state that evidence that defendant rotated between the victim's house, two other individuals' houses, and homelessness, as well as evidence that those two other individuals' houses were no longer available to defendant, was relevant and not rendered inadmissible by OEC 404(3)'s rule against propensity evidence. We also agree that evidence of defendant's dislike of homelessness and history of sustaining injuries while homeless was relevant and not rendered inadmissible by OEC 404(3)'s rule against propensity evidence. Defendant's housing difficulties, dislike of homelessness, and history of injuries while homeless (which he associated with homelessness) were relevant to explain the state's theory of motive, that is, why defendant would "let [the victim] die," rather than leave the house when the victim tried to evict him; defendant was out of options for housing and homelessness was an undesirable outcome for him. *State v. Hampton*, 317 Or 251, 257 n 12, 855 P2d 621 (1993) ("Motive is * * * a cause or reason that moves the will and induces action, an inducement which leads to or tempts the mind to commit an act." (Internal quotation marks omitted.)).

Additionally, in the trial court, the state viewed as relevant for nonpropensity purposes evidence that defendant performed work at the two other individuals' houses in exchange for housing, just as he did at the victim's house. The state argued that defendant's conduct while living at the other individuals' houses was relevant for nonpropensity purposes, and—on appeal—points to various aspects of defendant's conduct while living at those individuals' houses: for example, that defendant believed he could "talk to spirits"; that defendant was outside one night waving a knife and "ranting to the heavens"; that defendant

"brought people to the property" whom one of the individuals perceived as "junkies and unsafe"; and that defendant caused property damage.

In our view, evidence regarding defendant's conduct while staying at the two individuals' houses relies on propensity reasoning for its relevance; therefore, the trial court did not err in excluding that evidence under OEC 404(3), given the theories of relevance advanced by the state.

*The Strickland interview.* Finally, we turn to defendant's "interview" with Strickland, the polygraph examiner.

In the trial court, the state argued the interview was relevant based on defendant's admissions to (1) creating a pile of clothing in the room where the victim's body was found under a large pile of clothing; (2) cleaning that room; and (3) that there were occasions where defendant may have shoved the victim, including at least one occasion where defendant pushed past the victim after the victim indicated he wanted defendant to leave the victim's property. The trial court ruled that the entire interview was irrelevant, determining that it had "no value at all for the state."

On appeal, the state argues that "the evidence that the state sought to admit consists of defendant's own statements regarding his relationship with the victim (both generally and in the days leading up to the charged events), his housing situation, what he believed ultimately happened to the victim, and his whereabouts after the victim was last seen" by the victim's friend, and that, in the interview, "defendant admitted *** he created the pile of clothing under which the victim's body was found," to "being in the room where the victim's body was found—after the victim went missing—and cleaning the room with 'chemicals,' closing the bedroom door, and opening a window so that the room could 'air out,'" and stated that the "last time I saw [the victim] he was alive—I didn't see him in rigor mortis."

Defendant responds, "the sole preserved issue relates to whether the interview is relevant based on defendant's statements regarding the pile of clothing." Regarding the merits, defendant argues that the state's proffered reason for admitting the interview "was that it was relevant to

show that defendant covered the deceased's body with cloth-ing," but "defendant's statements did not suggest that fact and therefore were not relevant."

Our review of the record indicates that the state preserved its argument as to the relevancy of the Strickland interview with regard to defendant creating the pile of cloth-ing in the victim's room under which the victim was found, cleaning and airing out the room the victim was found in, and pushing past the victim after the victim indicated he wanted defendant to leave the victim's property. *See State v. Parkins*, 346 Or 333, 341, 211 P3d 262 (2009) (noting that, "[u]ltimately, the preservation rule is a practical one, and close calls—like this one—inevitably will turn on whether, given the particular record of a case, the court concludes that the policies underlying the rule have been sufficiently served").

Turning to the merits, OEC 401 affords "a very low threshold" for relevance. *State v. Sacre*, 222 Or App 391, 398, 193 P3d 70 (2008) (internal quotation marks omitted). "Evidence need only slightly increase or decrease the prob-ability of the existence of a fact of consequence," and "[t]he inference to be drawn from the evidence need not be neces-sary, or even the most probable inference; if the evidence or the inferences reasonably drawn from the evidence make the existence of a fact of consequence *any* more or less likely, the evidence is relevant." *Id.* (internal quotation marks omitted; emphasis in original). That standard was met with regard to defendant's statements about creating the pile of clothing, and cleaning and airing out the room where the victim was found.

Turning to defendant's statement that he pushed past the victim after the victim indicated that he wanted defendant to leave the victim's property, one could reason-ably infer that defendant did so because he wanted to stay in the victim's house. That evidence therefore is relevant under both the "common motive" and "supplied the motive" theo-ries as described above. 321 Or App at 667.

*Conclusion.* In sum, the trial court erred, in part, when it excluded various categories of evidence as either irrelevant or inadmissible by operation of OEC 404(3) in its

pretrial order *in limine*. We therefore reverse those portions of the order.

Reversed in part and remanded; otherwise affirmed.